**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| TONYA HILL, | ) |
|     **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | )    **CIVIL ACTION NO. 1:19-cv-103-KD-C** |
| | ) |
| HOUCHENS FOOD GROUP, INC., | ) |
| d/b/a PIGGLY WIGGLY | ) |
|     **Defendant.** | ) |

**ORDER**

This matter is before the Court on Defendant Houchens Food Group, Inc.'s (d/b/a Piggly Wiggly) Motion for Summary Judgment (Docs. 34, 35, 36); Plaintiff Tonya Hill's Response (Docs. 41, 42); and Defendant's Reply (Docs. 45, 46).

**I.**    **Findings of Fact**[1]

Plaintiff Tonya Hill, an African American, was hired in 1991 by non-party Food Giant to work at the Monroeville, Alabama Piggly Wiggly. (Doc. 36-1 at 32 (Dep. Hill at 30)).  Until her termination in February 2018, Hill worked as a stocker for the majority of her time at Piggly Wiggly. (Id. (Dep. Hill at 30)).

In January of 2018, Hill's employer became Defendant Houchens Food Group (Houchens). (Doc. 36-1 at 32 (Dep. Hill at 30)). According to Kevin Ladd, the President and Chief Executive Officer of Food Giant Supermarkets, Inc.:

> Food Giant and the [Monroeville] store were purchased by Houchens Food Group, Inc. ("Houchens"), and effective January 1, 2018, all Food Giant Employees at the store, including Ms. Hill, became eligible to become Houchens employees. Ms. Hill

---

[1] At the summary judgment stage, the facts are taken in the light most favorable to the non-movant. Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998-99 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

was one of those employees who was hired by and became an employee of Houchens.

(Doc. 45 at 6 (Aff. Kevin Ladd at 2)). Despite the change in ownership, the store was still called Piggly Wiggly. (Doc. 36-1 at 32 (Dep. Hill at 30)). Hill continued working as a stocker under Houchens' ownership. (Id. (Dep. Hill at 30)).

Hill considered Rachel Johnson (Johnson) and George Cole (Cole) to be her supervisors under the ownership of Food Giant and Houchens. (Id. at 33 (Dep. Hill at 31)). Johnson began working for Food Giant at the Monroeville Piggly Wiggly in 2014 as the store manager.[2] (Doc. 36-3 at 12-13 (Dep. Johnson at 10-11)). Cole has worked for Food Giant/Houchens since 2011. (Doc. 36-2 at 11 (Dep. Cole at 9)). Cole worked as an assistant manager at the Monroeville store. (Id. at 12 (Dep. Cole at 10)). Hill testified that as of February 2018, Cole had been the assistant manager at the Monroeville store for "[a]bout a month." (Doc. 36-1 at 33 (Dep. Hill at 31)).

On February 22, 2018, Hill was terminated. (Id. at 36 (Dep. Hill at 34)). In a light most favorable to Hill, the events preceding the termination are as follows: On the day of her termination, Hill asked Cole where he would like her to work; Cole asked Hill to stock the frozen food section. (Id. at 43 (Dep. Hill at 41)). Hill took a buggy of frozen food to the frozen food area of the store to begin stocking around 8:00 a.m. (Id. at 107-108, 110 (Dep. Hill at 105-107, 108)). Cole saw Hill fill her buggy with frozen food and then return to the sales floor. (Doc. 36-2 at 23 (Dep. Cole at 21)). Sometime that morning after Hill began stocking, she left her buggy to go to the bathroom. (Doc. 36-1 at 112 (Dep. Hill at 110)). According to Cole, he "made it back around [the frozen foods area] at some point and I did not see her, [Hill]." (Doc. 36-2 at 24 (Dep. Cole at

---

[2] Johnson started working for Food Giant (at a different store) in 2010. (Doc. 36-3 at 12-13 (Dep. Johnson at 10-11)).

2

22)). Cole saw Hill's buggy unattended and looked around the store for Hill. (Id. (Dep. Cole at 22)). When he could not find her, he returned to his work. (Id. at 25 (Dep. Cole at 23)).

Later, according to Cole, Brenda McIntosh (McIntosh)—the office manager— asked Cole if he had seen Hill as Hill's husband was looking for her. (Id. at 25 (Dep. Cole at 23)). Cole testified that he again looked for Hill, was unable to find her, and returned to his work. (Id. (Dep. Cole at 23)). McIntosh testified that she paged Hill because "[h]er husband came in and asked me could I page Tonya, and I paged her to come to the front for assistance because her husband was looking for her." (Doc. 36-4 at 29 (Dep. McIntosh at 27)). According to McIntosh, Hill did not come when paged. (Id. (Dep. McIntosh at 27)).

After Cole looked for Hill again, he saw Hill on the aisle stocking frozen vegetables and approached her. (Doc. 36-2 at 27 (Dep. Cole at 25)); and see Doc. 36-1 at 119 (Dep. Hill at 117)). According to Hill, Cole came around the corner to the aisle she was working on and "hollered hey…Tonya, I've been looking for you for almost 40 minutes." (Doc. 36-1 at 118-119 (Dep. Hill at 116-117)).

Hill testified that she did not speak to Cole until he got to her buggy of frozen food. (Doc. 36-1 at 118 (Dep. Hill at 116)). Hill said there was a customer nearby when Cole approached her. (Id. at 108 (Dep. Hill at 106)). When Cole got to Hill's buggy, Hill stated to Cole that she might have been in the bathroom when Cole was looking for her. (Id. at 119 (Dep. Hill at 117)).[3] According to Hill, Hill did not say anything else to Cole while they were in the frozen food section of the store. (Doc. 36-1 at 119 (Dep. Hill at 117)). Cole asked Hill to come to the office to speak with him. (Id. at 119, 126 (Dep. Hill at 117, 124); Doc. 36-2 at 29 (Dep. Cole at 27)).

---

[3] Cole testified that Hill "raised her voice and said, 'I've been in the bathroom, George. Can I go to the bathroom, George? George can I go to the bathroom?'" (Doc. 36-2 at 29 (Dep. Cole at 27)).

Cole also asked Nakalya Straughn (Straughn), a deli department employee, to join him and Hill in the office. (Doc. 36-1 at 127 (Dep. Hill at 125)). Once in the office, Hill testified her conversation with Cole occurred as follows:

> I was trying to explain myself to him about not being in the restroom for 40 minutes. [Cole] kept saying that I kept interrupting him. And it came to the point where he said, well, I can't get nothing in. And at that point he was like you're not letting me say anything. Just be quiet. I said, well, I have freedom of speech and I'm trying to just explain to you and see why the situation went off like it did. And he was just, like, go back to work before I write you up for being insubordinate. And that's what I did.

(Id.). Hill testified that she did not yell at Cole, did not raise her voice, did not use profanity, and did not interrupt Cole during their conversation in the office. (Doc. 36-1 at 130 (Dep. Hill at 128)).

Cole described Hill as "being loud, very inappropriate and rude, and telling me she was not going to do what I was telling her to do." (Id. at 32 (Dep. Cole at 30)). Per Cole, Hill acted inappropriately by "raising her voice. Disrespecting the position of assistant manager." (Id. (Dep. Cole at 30)). Cole contends Hill told him three times she would not return to work. (Id. (Dep. Cole at 30)). Eventually, Hill returned to work. (Id. at 32 (Dep. Cole at 29)).

Cole called human resources after his discussion with Hill and spoke with Sharon Grooms (Grooms) to discuss the matter. (Doc. 36-2 at 35-36 (Dep. Cole at 33-35)). Grooms instructed Cole: "to call the store manager to have her come and investigate it and have me and [Nakayla Straughn] write statements and give them to her." (Id. at 36 (Dep. Cole at 34)). Cole wrote a statement and instructed Straughn to write a statement. (Id. (Dep. Cole at 34)). Cole called Johnson and "relayed the information that Ms. Grooms had given [him]." (Id. at 37 (Dep. Cole at 35)). Johnson came to the store and Cole gave her the statements. (Id. at 37-38 (Dep. Cole at 35-36)).

In addition to these statements, Johnson also interviewed Hill and Straughn. (Doc. 36-1 at 137 (Dep. Hill at 135)). Hill explained her conversation with Johnson as follows:

> I was trying to explain to her that I hadn't went to no bathroom and went for 40 minutes. And I guess he—Mr. George Cole had told her that I yelled at him. She looked at Nakayla Straughn and asked Nakayla did I yell. Nakayla told her yes. And she told me, myself, looking at me and that she was there to handle the situation and that I was terminated.

(Id. at 138 (Dep. Hill at 136)). Johnson testified about her conversation with Hill as follows:

> George said you got really loud with him on the floor.[4] And she [Hill] said: I really didn't get that loud with him, and I looked at [Straughn] and I said: [Straughn], did she get loud with him. And [Straughn] looked straight at her [Hill] and said: Yes, you did. You were really loud.

(Doc. 36-3 at 42-43 (Dep. Johnson at 40-41)). Johnson also asked Straughn: "Did she [Hill] just tell him [Cole] no and she [Straughn] said yes" when Cole told Hill to return to work. (Doc. 36-3 at 45 (Dep. Johnson at 43)).[5]

After Hill met with Johnson, she understood that her employment had been terminated, she collected her things, and left the store. (Doc. 36-1 at 141 (Dep. Hill at 139)). Hill testified that she understood her termination was due to insubordination. (Id. (Dep. Hill at 139)). Additionally, Hill testified that neither Cole nor Johnson said or did anything racial in nature during the February 22, 2018 conversation. (Id. at 131, 141 (Dep. Hill at 129, 139)). According to Houchens, Hill was terminated for insubordination and refusing direct work instructions, i.e., to return to work. (Doc. 36-3 at 47 (Dep. Johnson at 45)).

Hill alleges she was terminated because of her race. (Doc. 36-1 at 63-64, 104 (Dep. Hill at 61-63, 102). Hill alleges generally that Caucasian people were treated better than she was. (Id. at 148 (Dep. Hill at 146)). Hill also testified to other problems at the store prior to her termination

---

[4] Johnson clarified that that she didn't ask Straughn which place Hill got loud, rather she just asked her if Hill got loud.  (Doc. 36-3, p. 43).

[5] Hill alleges this is a disputed fact but she fails to present any <u>evidence</u> (e.g. a denial under oath) that Straughn did not tell Johnson that Hill refused to return to work.

including: "being talked to with disrespect, changing my schedule, trying to make me work all—every Sundays, and taking my position..." (Doc. 36-1 at 44 (Dep. Hill at 42)).[6] Specifically, Hill stated Johnson spoke disrespectfully to her. (Id. (Dep. Hill at 42)). Hill said she did not file any complaints, claims, or grievances; she also did not contact human resources about these issues. (Id. at 45 (Dep. Hill at 43)). According to Hill, Johnson's disrespectful comments concerned Hill's "size and different stuff like that, and my color, shape, color, and just little nitpick things that I took offense of…." (Id. at 47 (Dep. Hill at 45)).

Hill initiated this litigation on March 4, 2019 against Houchens Food Group, Inc., and Food Giant Supermarkets, Inc.,[7] alleging racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (as amended) and 42 U.S.C. § 1981. (Doc. 1 at 1). Hill asserts she was the subject of discriminatory termination/discipline due to her race, African American. (Id.). Houchens moves for summary judgment on Hill's claims.

## III.  **Conclusions of law**

### A.  **Standard of review**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Defendants, as the parties seeking summary judgment, bear the initial responsibility of informing the district court of the basis for their motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

---

[6] Hill is referring to being demoted from stock clerk to stocker. (Doc. 36-1 at 48 (Dep. Hill at 46)). Hill was in a supervisory role over other stockers around 2015. (Id. at 37 (Dep. Hill at 35)). Hill testified she was stock clerk until "Ms. Rachel wanted someone else." (Id. at 38 (Dep. Hill at 36)).

[7] Food Giant Supermarkets, Inc. was dismissed as a party on July 17, 2019. (Doc. 25).

Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof—that a genuine dispute of material fact exists—the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter…the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998–99 (11th Cir. 1992) (internal citations and quotations omitted).

**B.    Analysis[8]**

Under Title VII, it is unlawful for an employer to "discharge any individual or otherwise to discriminate against any individual" because of the individual's race. 42 U.S.C. § 2000e-2(a)(1). To prevail "[i]n a Title VII claim for illegal termination based on racial discrimination, the plaintiff must prove the defendant acted with discriminatory intent." Hawkins v. Ceco Corp., 883 F.2d 977, 980-1 (11th Cir. 1989) (citing Clark v. Huntsville City Bd. of Educ., 717 F.2d 525, 529 (11th Cir. 1983)). Hill may establish her claims with direct evidence, circumstantial evidence, or statistical proof. Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1274 (11th Cir. 2008).[9] There is no allegation

---

[8] When a Title VII claim is based on the same facts as a Section 1981 and/or 1983 claim, "the analysis is the same under all theories of liability, and the claims need not be analyzed separately." Lindsey v. Board of School Com'rs of Mobile Cty., 491 Fed. Appx. 8, 9 (11th Cir. 2012). See also e.g., Richardson v. Leeds Police Dep't, 71 F.3d 801, 806 (11th Cir. 1995) (with "disparate treatment, in which § 1983 is employed as a remedy for the same conduct attacked under Title VII, the elements of the two causes of action are the same[ ]"); Abel v. Dubberly, 210 F.3d 1334, 1338 (11th Cir. 2000) (same); Butts v. County of Volusia, 222 F.3d 891, 893-894 (11th Cir. 2000) (same). See also King v. Butts Cty., 576 Fed. Appx. 923, 931 (11th Cir. 2014) (same). As such, the claims are analyzed together.

[9] "Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact [in issue] *without inference or presumption*." Carter v. City of Miami, 870 F.2d 578, 581–82 (11th Cir. 1989) (emphasis added); accord Castle v. Sangamo Weston, Inc., 837 F.2d 1550, 1558 n. 13 (11th Cir. 1988); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 n. 6 (11th Cir. 1987). "[O]nly the most blatant

or submission of direct evidence or statistical proof. Thus, Hill's claims are based on circumstantial evidence.

When there is only circumstantial evidence, courts apply the framework in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). See e.g., Chapman v. Al Transp., 229 F.3d 1012, 1024 (11th Cir. 2000). And See Burke-Fowler, 447 F.3d at 1323 (using the McDonnell-Douglas burden-shifting procedure to analyze racial discrimination claims based on circumstantial evidence). The Eleventh Circuit explained the burden-shifting process as follows:

> Under the *McDonnell Douglas* framework, a plaintiff must show an inference of discriminatory intent, and therefore carries an initial burden of establishing a prima facie case of discrimination. *Id.* at 802, 93 S.Ct. 1817. Presenting a prima facie case is not onerous as it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997) (citations omitted).
>
> The successful assertion of a prima facie case then "creates a rebuttable presumption that the employer unlawfully discriminated against" the plaintiff. *E.E.O.C. v. Joe's Stone Crabs, Inc.,* 296 F.3d 1265, 1272 (11th Cir.2002) (citing *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)). If this occurs, and a prima facie case of discrimination is presented, the burden of producing evidence that the employer's action was taken for a legitimate, non-discriminatory reason then shifts to the employer. *See Joe's Stone Crabs,* 296 F.3d at 1272.
>
> In the last step of the burden-shifting analysis, if the employer meets "its burden of production, the presumption of discrimination is rebutted, and the inquiry 'proceeds to a new level of specificity,' in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." *Id.* at 1272–73 (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). The focused inquiry in the last step requires the plaintiff to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir.1997) (internal quotation marks and citation omitted).

---

remarks, whose intent could be nothing other than to discriminate on the basis of age, ... constitute direct evidence of discrimination." Carter*,* 870 F.2d at 582. For example, a management memorandum saying, "Fire Earley—he is too old" would be direct evidence of age discrimination. Earley v. Champion Intern. Corp., 907 F.3d 1077, 1081 (11th Cir. 1990).

Rioux, 520 F.3d at 1275 (11th Cir. 2008). And see Durham v. Rural/Metro Corporation, 2020 WL 1899793 (11th 2020).

1.  ***Prima Facie* Case**[10]

"Under McDonnell-Douglas, a plaintiff establishes a *prima facie* case of race discrimination by demonstrating that she (1) is a member of a protected class, (2) was qualified for her position; (3) suffered an adverse employment action, and (4) was replaced by someone outside of her protected class or was treated less favorably than a similarly situated employee outside of her class." Abram v. Von Maur, Inc., 719 Fed.Appx. 929, 931 (11th Cir. 2018) (citing McDonnell-Douglas, 411 U.S. 792); Lewis v. City of Union City, 918 F.3d 1213, 1224 (11th Cir. 2019) (same).

Hill satisfies the first three elements of her *prima facie* case because: 1) Hill is African American; she was qualified for her job; and she was terminated. See e.g., St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993) (satisfying the prima facie case in part because the plaintiff was African American, was qualified, was demoted, and ultimately was terminated). Houchens does not dispute that these elements are satisfied for purposes of summary judgment. (Doc. 35 at 18).

As to the fourth element, Hill must show that "she and her preferred comparators were 'similarly situated in all material respects.'" Lewis v. City of Union City, 918 F.3d 1213, 1224 (11th Cir. 2019) (the Eleventh Circuit explained the parameters of this standard in a termination case). And see Smith v. Vestavia Hills Board of Education, 791 Fed.Appx. 127, 131 (11th Cir.

---

[10] Hill asserts she was the subject of discriminatory termination and discriminatory discipline. However, on summary judgment the parties address this in terms of discriminatory termination i.e. discipline that resulted in same. Discriminatory termination and discriminatory discipline consider the same factors outlined in Lewis. See e.g., Pearson v. Georgia through Davis, 2020 WL 2316594, *7 (11th Cir. 2020) (using the Lewis factors in a discriminatory discipline case to analyze whether proffered comparators were 'similarly situated in all material respects.').

2019) (same). This does not require that the proffered comparators have the exact job title or that

the plaintiff "and her comparators be identical save for their race or gender." Lewis, 918 F.3d at

1227. The Eleventh Circuit explained that a comparison  "will turn not on formal labels, but rather

on substantive likeness." Id. at 1228. "Ordinarily, for instance, a similarly situated comparator:"

- will have engaged in the same basic conduct (or misconduct) as the plaintiff, *see, e.g.*, *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 580, 583 (6th Cir. 1992) (holding that a plaintiff terminated for "misuse of [an employer's] property" could not rely on comparators allegedly guilty of "absenteeism" and "insubordination");

- will have been subject to the same employment policy, guideline, or rule as the plaintiff, *see, e.g.*, *Lathem*, 172 F.3d at 793 (holding that a plaintiff's proffered comparators were valid where all were subject to the same "workplace rules or policies");

- will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff, *see, e.g.*, *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) (observing that "disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis"); and

- will share the plaintiff's employment or disciplinary history, *see, e.g.*, *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 304 (6th Cir. 2016) (explaining that "[d]ifferences in experience and disciplinary history" can disqualify a plaintiff's proffered comparators).

Id. at 1227-28. In Lewis, the Eleventh Circuit expressly acknowledged that the 'all material

respects' standard "serves the interest of sound judicial administration by allowing for summary

judgment in appropriate cases—namely, where the comparators are simply too dissimilar to permit

a valid inference that invidious discrimination is afoot." Id. at 1228.

Houchens contends Hill has not satisfied the last element of the *prima facie* case—that she

was either treated less favorably than a similarly situated employee outside of her class or replaced

by someone outside of her class. (Id. at 18). According to Houchens "there is no evidence that,

after it terminated Hill, Houchens hired or otherwise replaced Hill with someone of a different

race." (Id.). Houchens also asserts Hill has "failed to put forth any evidence" that she was treated less favorably than someone outside of her protected class. (Id. at 19).

In response, Hill proposes eight (8) Caucasian comparators: Nathan Bell, Kim Scarborough, Pearl Gibson, Beth Bonner, Ruby Watson, William Watson, Zack McCraney, and Jerry Lowry. (Doc. 42 at 22-25). Hill asserts each of these Caucasian individuals acted insubordinately but were treated more favorably than her. (Id. at 20). The Eleventh Circuit's guidance in Lewis instructs that at this juncture we assess the following factors: 1) jurisdiction of the same supervisor; 2) subject to the same employment policies; 3) similar disciplinary histories; and 4) similar conduct/misconduct. Lewis, 918 F.3d at 1227-28.

### a. *Store Ownership, Jurisdiction of Supervisors, and Store Policies*

Houchens states that Hill's comparators are improper in part because Hill has "no facts or evidence which shows that Johnson, Cole and the comparators were employees of Houchens (as opposed to employees of non-party Food Giant) when the comparators[']…" alleged misconduct occurred. (Doc. 35 at 12). Moreover, Houchens asserts Hill has not shown "that after Houchens took over the store in January 2018….Houchens was made aware of the comparators' alleged inappropriate attitude and the alleged favorable treatment they had received from Johnson and Cole." (Id. (citations omitted)). In response, Hill contends she and the proposed comparators were "similarly situated….in the Monroeville store regardless of who owned the store." (Doc. 42 at 20).

The Monroeville store under Houchens essentially continued the operations of its predecessor. Johnson testified that the management remained the same and she ran the store the same after Houchens took over the store. (Doc. 36-3 at 17-18 (Dep. Johnson at 15-16)). Per Johnson, she still reported to the same manager. (Doc. 36-3 at 17-18 (Dep. Johnson at 15-16)). When Houchens took over ownership of the store, Houchens implemented a new employee

handbook. (Doc. 36-3 at 19 (Dep. Johnson at 17)). However, Johnson explained that under both owners, similar policies, procedures, and rules were in force; she applied the policies the same ways. (Id. at 17, 25 (Dep. Johnson at 15, 23)).

As discussed *supra*, proper comparators also will "have been under the jurisdiction of the same supervisor as the plaintiff." See e.g., Jones v. Gerwens, 874 F.2d 1534, 1541 (11th Cir. 1989). Hill asserts she and her comparators "all worked for the Piggly Wiggly in Monroeville, Alabama…[and] were managed by Rachel Johnson, who was the Store Manager under both Houchens and Food Giant." (Doc. 42 at 20). And see (Doc. 36-3 at 61-66 (Dep. Johnson at 59-64)). Although this appears to be an issue of first impression, comparator evidence from decisions made under prior ownership is appropriate under the facts of this case. To the extent the decision was made by the same supervisor, acting under the same policies and guidelines, the comparator evidence is relevant to the inquiry of whether the supervisor acted with racial bias. A corporation generally can only act through a person. And, here it is Johnson's action of terminating Hill that is being challenged as improperly motivated by race. Thus, Johnson's prior actions of discipline, acting under substantially similar or identical policies, may be relevant to the inquiry.

###### b. *Disciplinary histories*

Proper comparators generally have similar disciplinary records. Lewis, 918 F.3d at 1227-28. Hill does not present any disciplinary history for her proffered comparators. But, Hill states in her response that "she had a clear disciplinary record, no history of rule breaking, and was a long-term employee." (Doc. 42 at 29). And see (Doc. 36-3 at 33 (Dep. Johnson at 31) (Johnson testified that she did not recall any "problems with Tonya [Hill]" prior to the incident for which Hill was terminated). Accordingly, this is not a relevant factor.

###### c. *Conduct/Misconduct*

12

The decision to terminate was made by Johnson. (Doc. 36-3 at 42, 44 (Dep. Johnson at 40, 42)). Before making the decision, Johnson heard Cole's version of the incident, read the statements of Cole and Straughn, and then interviewed Straughn and Hill. (Doc. 36-3 at 42-43 (Dep. Johnson at 40-41)). Hill denied that she got loud with Cole, however Straughn disagreed. (Doc. 36-3 at 43 (Dep. Johnson at 41)). Straughn also confirmed that Hill refused to return to work when directed to do so by Cole. (Doc. 36-3 at 45 (Dep. Johnson at 43)).[11] Based on this independent investigation, Johnson determined that Hill had been insubordinate by failing to return to work when directed to do so by Cole and by being disrespectful to Cole.

Hill denies that she refused to return to work or yelled at Cole. (Doc. 36-1 at 129, 132 (Dep. Hill at 127, 130)). "However, [Hill] cannot discharge [her] burden to make out a *prima facie* case of discrimination by claiming that [she] did not commit the alleged violations…" Horn v. United Parcel Services, Inc., 433 Fed.Appx. 788, 795 (11th Cir. 2011). Instead, the Court analyzes whether Hill and her proffered comparators were "'involved in or accused of' similar conduct but received disparate" treatment. Id. (citing Burke-Fowler, 447 F.3d at 1323).

> *d. Application of Lewis Factors to Proposed Comparators*

> *1.     Nathan Bell*

Nathan Bell (Bell) was an assistant store manager under Johnson. (Doc. 36-3 at 30-32 (Dep. Johnson at 28-30)). Bell is Caucasian. (Id. at 27 (Dep. Johnson at 25)). Bell and Hill both worked at the Monroeville store for over twenty (20) years. (Doc. 36-3 at 30 (Dep. Johnson at 28); Doc. 36-1 at 31 (Dep. Hill at 29)). Hill asserts "Ms. Rachel [Johnson] and [Bell] would always be arguing on the floor about the floors, about what he did that particular night or what he didn't do,

---

[11] Straughn's affidavit avers that Cole told Hill to return to work and Hill "refused to do so, saying in a loud voice…that she 'had freedom of speech' and to 'just finish telling [me] what [you] was trying to say." (Doc. 36-5 at 3).

what he didn't tell the stockers to do on the floor. She never reprimanded him…or fired him." (Doc. 36-1 at 152 (Dep. Hill at 150)). Hill also asserts that Bell "never learned how to do the paperwork, contrary to explicit instructions" yet Bell was not demoted for this insubordination. Moreover, according to Hill, even though Bell had a history of transgressions "worse than the single transgression Plaintiff was accused of," Bell kept his job even after making a racial comment. (Doc. 42 at 23). Hill argues she is "similarly situated to Bell in all relevant respects;" race is the only difference between the two. (Id. at 24).

According to Johnson, Bell was instructed to learn how to do paperwork and told he would be demoted if he did not learn, but Bell "just couldn't learn it." (Doc. 36-3 at 30-31 (Dep. Johnson at 28-29)). Johnson said Bell tried to learn how to do the paperwork but Bell "would always try to say he was more like a workhorse than, you know, a manager." (Id. at 31 (Dep. Johnson at 29)). Bell was not demoted until he made a racial comment to a customer. (Doc. 36-3 at 27 (Dep. Johnson at 25)). Bell was then demoted from an assistant store manager to stocker. (Id. (Dep. Johnson at 30)).

Though Hill does not have to "prove purely formal similarities—e.g., that she and her comparators had precisely the same title"— Bell's title was not the only difference between his job and Hill's. Bell had different job responsibilities and as a manager, Bell had subordinates. Any failure by Bell would be failure in his managerial duties; Hill was not a manager so their conduct or misconduct is not comparable. See e.g., Smith v. City of Birmingham, 2019 WL 4600056, *8 (N.D. Ala. 2019) (finding any misconduct by manager distinguishable from the plaintiff/employee who was not a manager).

Hill also argues Bell was insubordinate for failing to learn how to do paperwork after being instructed to do so. (Doc. 42 at 23). But, Johnson testified Bell did not refuse to learn how to do the paperwork; he tried but "he just couldn't learn it." (Doc. 36-3 at 31).

Moreover, Bell's racial comment, for which he was demoted but not terminated, is different than Hill's alleged insubordination. And, Johnson did not decide Bell's discipline for the racial comment. (Id. at 27 (Dep. Johnson at 25)). Johnson testified that she reported it to the District Management and they decided to demote Bell. (Id. at 27-28 (Dep. Johnson at 25-26)). See Jones v. Gerwens, 874 F.2d 1534, 1541 (11th Cir. 1989) ("Courts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis."). Thus, Bell is not a proper comparator.

### 2. *Kim Scarborough*

Kim Scarborough (Scarborough) is Caucasian and worked as a frozen foods stocker. (Doc. 36-1 at 149, 153 (Dep. Hill at 147, 151); Doc. 36-3 at 63 (Dep. Johnson at 61)). Hill testified that she observed "Kim [Scarborough] and George [Cole] get into it on the floor… [H]e told her that if she did not finish her stock, she was not to leave. She told him she had to pick her kids up at 3:00 and she left. And then I had to do her—finish her work." (Doc. 36-1 at 153 (Dep. Hill at 151)).[12]

Scarborough and Hill were both stockers, both reported to Johnson, and both were subject to the same store policies. Hill explained that after this incident occurred, she did not observe

---

[12] Per Cole, he did not recall the particular incident with Scarborough that Hill described. (Doc. 36-2 at 46 (Dep. Cole at 44)). Cole also testified that he instructs all of his employees that "[w]hen we finish, we get off" and "[i]f the employee feels like they are finished, their perception of finished and mine may be different." (Id. (Dep. Cole at 44)). Cole explained, "if an employee was stocking a section and they put the back stock up and they said they were done, me going back through it and finding things that would still go out is just my knowledge and not so much the employee being insubordinate." (Id. (Dep. Cole at 44)).

Scarborough get reprimanded or written up; Hill also stated she did not have access to Scarborough's file to confirm or deny this. (Doc. 36-1 at 153-54 (Dep. Hill at 151-52)). Per Hill though, Scarborough returned to work the following day. (Id. at 153 (Dep. Hill at 151)).

Hill has not shown that Scarborough is a similarly situated comparator. There is no evidence that Cole reported Scarborough's conduct to Johnson or that Johnson knew of Scarborough's conduct. It is Johnson's response to the comparator conduct that is relevant. "[D]isciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis." Hester v. University of Alabama Birmingham Hospital, 798 Fed.Appx. 453, 457 (11th Cir. 2020) (quoting Jones v. Gerwens, 874 F.2d 1534, 1541 (11th Cir. 1989)) (internal citations omitted); Silvera v. Orange County School Board, 244 F.3d 1253, 1261 n. 5 (11th Cir. 2001) ("Differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination"). Johnson, not Cole, terminated Hill.[13] Thus, Scarborough and Hill are not similarly situated in all material respects.

### 3.   *Remaining Comparators*

Hill asserts six other Caucasian employees acted insubordinately yet were not terminated. Hill recounts the following incidents in support:

- Pearl Gibson (cashier): "Fussed at" Cole without reprimand. (Doc. 36-1 at 151 (Dep. Hill at 149); Doc. 36-2 at 44-45 (Dep. Cole at 42-43)).

---

[13] Cole was not in the decision making process of Hill's termination. Rather, he was a fact witness. There is no dispute that Johnson conducted an independent investigation prior to terminating Hill. And Hill has made no argument that Cole's alleged bias tainted the investigation. See Sims v. MVM, Inc., 704 F.3d 1327, 1335, n. 6 (11th Cir. 2013) ("'Cat's paw' theory of liability, also referred to as 'subordinate bias theory,' is liability seeking to hold an employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision."). And see Sirpal v. University of Miami, 509 Fed.Appx. 924 (11th Cir. 2013) (stating this case is not a cat's paw situation because the independent investigation determined that dismissal was, apart from the recommendation, entirely justified).

- Beth Bonner (position unclear): Had "an attitude" with Johnson on the floor without reprimand. (Doc. 36-1 at 150 (Dep. Hill at 148); Doc. 36-3 at 61 (Dep. Johnson at 59)).

- Ruby Watson (POS Clerk): Had "an attitude" with Cole and walked off without reprimand. (Doc. 36-1 at 154 (Dep. Hill at 152); Doc. 36-2 at 47 (Dep. Cole at 45)).

- William Watson (meat cutter and then meat manager position): "Got into it" on the floor and hollered at Johnson without reprimand. (Doc. 36-1 at 155 (Dep. Hill at 153); Doc. 36-3 at 65 (Dep. Johnson at 63)).

- Zack McCraney (position unclear): "Got into it" with Johnson without reprimand. (Doc. 36-1 at 156 (Dep. Hill at 154); Doc. 36-3 at 66 (Dep. Johnson at 64)).

- Jerry Lowry[14] (position unclear): "Had an attitude" with Cole and walked off without reprimand. (Doc. 36-1 at 155 (Dep. Hill at 153)).

Even if the Court assumes the "attitudes," "fussing" and "got into in" meant these individuals raised their voices at managers, these individuals' conduct was not the same misconduct as Hill's. Hill does not allege or present evidence that these individuals refused a work instruction from a manager, as she is accused to have done. As such, these proffered comparators are not similarly situated. Moreover, there is no evidence that Johnson was made aware of the conduct of Gibson, Ruby Watson, and Jerry Lowry. Thus, Cole's response is irrelevant. Accordingly, Hill has not carried her *prima facie* burden.

## 2.   <u>Convincing Mosaic</u>

"[E]stablishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case. Accordingly, the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." <u>Lewis v. City of Union City, Georgia</u>, 934 F.3d 1169,

---

[14] Plaintiff noted Jerry Lowry was incorrectly named "Jerry Buddy Henson." (Doc. 42 at 16).

1185 (11th Cir. 2019) (Lewis II) (quoting Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011)). "Indeed, plaintiffs may defeat a summary-judgment motion outside of the McDonnell Douglas framework by presenting "a convincing mosaic" of circumstantial evidence that raises a reasonable inference that the employer discriminated against him." White v. Dixie, 741 Fed.Appx. 649, 657 (11th Cir. 2018) (citing Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011)). "[T]he plaintiff will always survive summary judgment if [she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent[]" even without similarly situated comparators. Lockheed-Martin Corp., 644 F.3d at 1328. And see Lewis II, 934 F.3d at 1185 ("Not every employee subjected to unlawful discrimination will be able to produce a similarly situated comparator. Among other things, a proper comparator simply may not exist in every work place.").

A "convincing mosaic" may be shown by evidence that demonstrates, among other things, (1) "suspicious timing, ambiguous statements ..., and other bits and pieces from which an inference of discriminatory intent might be drawn," (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual. Lewis II, 934 F.3d at 1185 (citing Silverman, 637 F.3d at 733-34). "The evidence presented under a 'convincing mosaic' must be sufficient enough 'to overcome the lack of comparator evidence.'" Blash v. City of Hawkinsville and Pulaski County, Georgia, Sheriff's Office, 2019 WL 7340132 (M.D. Ga. 2019) (quoting Woodward v. Jim Hudson Luxury Cars, Inc., 2019 WL 4793058, *8 (S.D. Ga. 2019)).

The Eleventh Circuit in Lewis II explained that a convincing mosaic may be shown by evidence which demonstrates an employer's justification is pretextual. Lewis II, 934 F.3d at 1185. "A plaintiff can show pretext by: (i) casting sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's

proffered reasons were not what actually motivated its conduct, (ii) showing that the employer's articulated reason is false and that the false reason hid discrimination, or (iii) establishing that the employer has failed to clearly articulate and follow its formal policies." Id. at 1186.

Hill disputes that she acted insubordinately and she disputes that she refused to return to work. (Doc. 36-1 at 132 (Dep. Hill at 130)). But, "[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1265 (11th Cir. 2010). The Eleventh Circuit explained that in analyzing pretext:

> 'we must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees.' Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir.2002); cf.Wilson, 376 F.3d at 1092 ("Whether [plaintiff's] conduct was insubordinate is not an issue for this Court to referee."). The question to be resolved is not the wisdom or accuracy of [defendant's] conclusion…, or whether the decision to fire her was "prudent or fair." See Rojas, 285 F.3d at 1342. Instead, 'our sole concern is whether unlawful discriminatory animus motivate[d]' the decision. Id. (quotation marks and citation omitted).
>
> ***
>
> Title VII does not require the employer's needs and expectations to be objectively reasonable; it simply prohibits the employer from discriminating on the basis of membership in a protected class. We do not sit as a 'super-personnel department,' and it is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive. Chapman, 229 F.3d at 1030. That is true '[n]o matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers.' Id.

Alvarez, 610 F.3d at 1265. See also Jurriaans v. Alabama Cooperative Extension System, 2020 WL 1481600, *2 (11th Cir. 2020) (citing the pretext considerations from Alvarez post Lewis II, 934 F.3d 1169).

According to Houchens, it terminated Hill for insubordination, for getting loud, and for Hill telling Cole 'no' when told to return to work. (Doc. 36-3 at 47 (Dep. Johnson at 45)). Hill

must meet Houchens' proffered "reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that decision." Chapman v. Al. Transp., 229 F.3d 1012, 1031 (11th Cir. 2000). See also Jurriaans, 2020 WL 1481600 at *2 (citing Chapman, 229 F.3d at 1030 post Lewis II, 934 F.3d 1169).

Hill asserts that a convincing mosaic of racial discrimination is shown through evidence of Johnson's systematical better treatment of Caucasian employees than African American employees, the unfairness of the investigation and racial animus demonstrated by Johnson through her statements. (Doc. 42 at 27-30).[15]

---

[15] Hill points to the fact that both Houchens and Food Giant employed progressive disciplinary policies but she does not argue that failing to follow such a policy is evidence of pretext. (Doc. 42 at 6, 11, 21). The only pertinent statement from Hill about the discipline policy as it relates to her is when she alleges Caucasian employees were treated better than she was. She asserts: "when Hill was accused of breaking the rules related to insubordination she was immediately terminated even though she had a clear disciplinary record, no history of rule breaking and was a long-term employee." (Doc. 42 at 29). However, Hill does not submit the employee handbooks from either Houchens and Food Giant to show these progressive disciplinary policies. Without the policies or any evidence about if management had discretion, Hill cannot use this evidence to establish pretext. See: Ritchie v. Industrial Steel, Inc., 426 Fed. Appx. 867, 873 (11th Cir. 2011).

> A plaintiff can also show pretext by demonstrating that the employer did not follow its normal procedures in terminating his employment. See Morrison v. Booth, 763 F.2d 1366, 1374 (11th Cir.1985) ("Departures from normal procedures may be suggestive of discrimination."). **Other circuits have explained that, when an employer has established a progressive discipline policy, a plaintiff may establish pretext by showing that the policy was not followed in his case.** See Morris v. City of Chillicothe, 512 F.3d 1013, 1020 (8th Cir.2008) ("Deviance from a progressive discipline policy can be evidence of pretext**"). Nevertheless, if management has discretion as to whether to follow the discipline policy, then a failure to follow the policy does not show pretext.** See id. (holding that employer's failure to follow its discipline policy did not support a finding of pretext because the employer specifically reserved the right to fire at-will employees without a prior written warning); Fane v. Locke Reynolds, LLP, 480 F.3d 534, 541 (7th Cir.2007) (holding that plaintiff could not establish pretext based on employer's failure to follow its discipline policy because the plaintiff did not offer any evidence that the policy was "rigorously enforced," and because the policy contemplated immediate termination for certain offenses).

To support her assertion of systematical better treatment of Caucasian employees than African American employees, Hill reiterates the comparator evidence and highlights the fact that Nathan Bell was only demoted and not fired for making racial statements.  (Id. at 28-29).  As to Bell, Johnson only reported his misconduct, she was not the decision maker.  (Id. at 27-28 (Dep. Johnson at 25-26)).  Thus, Bell's lesser discipline fails to support that Johnson's decision to terminate Hill was racially motivated.  And as to the other evidence of employee misconduct that received lesser discipline, as stated previously the conduct was not sufficiently similar (and/or there is no evidence that Johnson was aware of the conduct) to be relevant to Johnson's motivation in terminating Hill for refusing to return to work.

Hill also relies on the testimony of two co-employees to support her contention that Johnson treated Caucasian employees better than African American employees. (Doc. 42 at 27-28; Doc. 41-6 at 1-2 (Dec. McCants at 1-2); Doc. 41-7 at 1 (Dec. K. George)). Keisha George (K. George), an African American, testified, that Johnson spoke more harshly to African American employees than Caucasian employees. (Doc. 41-7 at 1 (Dec. K. George at 1)). K. George does not provide any specifics to support this statement.  K. George also states, without citing any specifics, that Johnson reprimanded African American employees when she did not reprimand Caucasian employees. (Doc. 41-7 at 1 (Dec. K. George at 1)).[16] Neither of these conclusory allegations advance Hill's case. Another co-employee, Monica McCants (McCants)— an African-American— testified that she was reprimanded by Johnson for not tucking her shirt in and that a Caucasian employee who did the same was not reprimanded. (Doc. 41-6 at 1-2 (Dec. McCants at

---

[16] George also relates an incident where an employee, Ashley, was allowed to sit in an office instead of work.  George does not relate that incident to Johnson. (Doc. 41-7 at 2 (Dec. K. George at 2)).

1-2)).[17] This paucity of evidence, which is mostly conclusory, is insufficient to support a finding of systematical better treatment of Caucasian employees than African American employees by Johnson.

Next, Hill argues that Johnson's investigation was unfair and that this supports her contention that her termination was racially motivated.  However, the alleged unfairness is rooted in the fact that Johnson failed to credit Hill's version of the events and instead relied on the statements of Straughn and Cole. This does not make the investigation "unfair." Hill also takes aim at the fact that Johnson did not interview a customer who witnessed the confrontation between Cole and Hill on the floor of the store. (Doc. 42 at 30). But this too is a red herring because Hill was not terminated for what happened on the floor, she was terminated for what happened in the office. Only Hill, Cole and Straughn were in the office. Hill has failed to show that the manner in which the investigation was conducted adds any support to a convincing mosaic of racial discrimination.

The most compelling evidence Hill has submitted regarding Johnson's possible racial bias against Hill, is Monica McCants' testimony that McCants heard Johnson state "black people are lazy and don't work" and "see he's [in reference to an African American employee] lazy and doesn't want to come to work." (Doc. 41-6 at 1 (Dec. McCants at 1)). Racial comments "may evince evidence of the state of mind of the decision-maker at the time" the termination occurred. Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1361–63 (11th Cir. 1999) (finding manager's statement made immediately after terminating employee that he wanted "aggressive, *young* men" like himself to be promoted is highly suggestive circumstantial evidence from which a jury could infer discriminatory animus). However, there is no evidence as to when

---

[17]   McCants also avers to other incidents that she does not relate to Johnson. The comments McCants avers Johnson made are addressed *infra*.

the alleged comments were made.[18] See Pride-Fort v. North American Lighting, 2020 WL 1953804, *11 (N.D. Ala. 2020) (finding alleged racial remarks made months before plaintiff's termination to be isolated and unrelated to termination).  And, more important, Hill was not fired for alleged laziness, she was fired for insubordination and refusing to return to work when told to do so.  In sum, in the absence of any other evidence establishing a convincing mosaic (or showing pretext), one stray comment is insufficient to prove discriminatory intent by Johnson. See Scott v. Suncoast, 295 F.3d 1223, 1229 (11th Cir. 2002) (A comment made by his supervisor two years prior to plaintiff's termination, "we'll burn his black ass," was insufficient to show pretext); see also Ritchie v. Industrial Steel, Inc., 426 Fed. Appx. 867, 873 (11th Cir. 2011) ("[S]tray remarks that are isolated and unrelated to the challenged employment action" generally are insufficient to prove discriminatory intent); Johnson v. Neopost, 2007 WL 9701787, *15 (N.D. Ga. 2007) ("Evidence of statements by themselves, however, are not sufficient to establish a case of pretext. Instead, a plaintiff must produce other evidence of pretext before such statements can constitute pretext.").

Accordingly, the Court finds that the evidence is insufficient to create a convincing mosaic of circumstantial evidence that raises a reasonable inference that Houchens' termination of Hill was based on race. And even if Hill could establish a prima facie case, her evidence is insufficient to show that the Houchens' reason for terminating Hill is pretextual.

## IV.   Conclusion

For the reasons discussed herein, Houchens' Motion for Summary Judgment (Doc. 94) is **GRANTED** on all claims.

---

[18] McCants worked at Piggly Wiggly for almost a year before the incident. (Doc. 41-6 at 1 (Dec. McCants at 1)).

**DONE** and **ORDERED** this the **27th day** of **May 2020**.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**CHIEF UNITED STATES DISTRICT JUDGE**